161                          State ex rel. Hardacre v. Dalton et al.

161                                  ELECTIONS.

[Hamilton Circuit Court, October Term, 1885.]

Cox, Smith and Swing, JJ.

\*STATE EX REL. HARDACRE V. J. DALTON ET AL., CANVASSERS OF ELECTION.

1. POWER OF CANVASSERS OVER RETURNS.

The canvassers of election cannot regard as a return a paper enclosed in an envelope, which paper does not on its face purport to be an official return, but is simply a note of results taken from a tally-sheet, addressed to some person or body, other than the clerk or official canvassers.

2. FORGED RETURNS TO BE REJECTED.

Where upon the *face of a return*, it is evident that there has been a forgery or falsification of figures, the canvassers should reject and not count such forgery or falsefied figures, whether the same were put there *before or after* the return came into the custody of the clerk.

3. DUTY OF CANVASSERS WHEN TALLIES ARE IN EXCESS OF VOTES.

When the tallies on a return are in excess of the number of votes on the poll-book, the canvassers should, if sufficiently large to show fraud and change in the result of the election, throw out the whole precinct, or they may divide the excess among the candidates of different parties proportionately, according to the rules laid down in McCrary on Elections. Sections 298, 299, 300.

4. ISSUING CERTIFICATES OF ELECTION.

Where in a proceeding in mandamus the court find that the relators have a plurality of votes, they may order the canvassers to so certify, and the clerk to issue certificates to the persons whom the *court* find elected, and this too even if the clerk had previously issued certificates of election to persons whom the court finds were not entitled to them. Boren & Guckes v. Commissioners Darke Co., 21 Ohio St., 311, 322.

Cox, J.

The relator claims that he, together with Frank Kirschner, James C. Richardson and Amzi McGill, were, at the October election, 1885, duly elected senators to the general assembly by a plurality of votes in the first senatorial district of Ohio. That the defendants, the canvassing board of said county, are proceeding to count certain illegal and fraudulent returns, and thereafter to give certificates of election to their opponents, James C. Hopple, John Brashears, Robert Kuehnert and Moses Wilson, based on said illegal returns, and asks the court to grant a peremptory mandamus to compel said board to count only the legal returns sent to them, and to award a certificate of election to relator.

One of the defendants, W. J. Sanderson, answers denying that he is about to count said votes and sets up that the returns of said election are so irregular that he is unable to say what should not be counted, and prays the instruction of the court as to his duty.

In our former decision, passing on what was regarded by both parties as a demurrer to the jurisdiction of the court to interfere by mandamus, we stated our position pretty fully sustaining suc jurisdiction.

We also hold that the answer of Daniel J. Dalton was such as to show that he was proceeding to do the things complained of in the petition, and that therefore the petition was not prematurely filed, and that the case should be heard on its merits.

I do not deem it necessary to repeat these views, or the arguments by which they can be sustained; but after hearing the whole case and examining what purports to be the returns which defendants are about to count, simply to state the result at which we have arrived.

A part of the answer of Daniel J. Dalton is in the nature of a plea in abatement, setting up the pendency of another suit in the court of common pleas of this county, which it alleges is between the same parties for the same subject-matter. On examining the record, we find that the cause of action referred to is not the same. *That* is an application to the court of common pleas for a restraining order to prevent the defendants from abstracting and counting certain illegal votes, and its only object was to stay the hands of the defendants until the action in the court should be determined; and so the court below ordered that the injunction should not operate to prevent defendants from obeying the order of this court on mandamus.

This plea we hold not be sustained by the record, and is overruled, and even if it were a good plea, it would only refer to one case here.

Coming then to apply the principles heretofore announced to the facts as proven before us, we hold that by the Revised Statutes "the clerks and justices shall not receive any paper

---

\*This case was decided by the Supreme Court in Hardacre v. Dalton. See opinion 43 O. S., 652. See also *ante*, page 82.

as a poll-book unless it be delivered at the clerk's office by one of the judges of the election held in such precinct." This is *mandatory*. They *shall not receive it*, means they shall not treat it as a return, either by canvassing or counting it. This rule is apparent from the whole tenor of the statutes. That to be the return of the election it must be sealed up and kept in charge by one of the judges, and by him delivered to the clerk at his office, and any paper deposited by any other person with the clerks is illegal. Taylor v.Wallace, 31 O. S., 151.

It was the duty of the canvassers, therefore, not to canvass or count or abstract in the canvass the so-called returns from Seventh Ward, Precinct E; Thirteenth Ward, Precinct C; Sixteenth Ward, Precinct E; Twenty-third Ward, Precinct B, neither of these having been delivered to the clerk by a judge in the precinct.

We hold also that the canvassers cannot regard any paper inclosed in the envelope as part of the return which does not purport on its face to be an official return for the canvassers, but does purport to be simply a note of results taken from the tally-sheets and delivered to some other person or body than the clerk or official canvassers.

Under this ruling, it was the duty of the canvassers to omit from the canvass the report addressed to the Duckworth Club inclosed in the envelope from Ninth Ward, Precinct F.

This paper returned as a poll-book from Fourth Ward, A, is signed at the foot of the poll-book and tally-sheets with the names of three judges and two clerks, but the names of the judges, it is very apparent to any observer, are all written by one person. At the foot of a list of 654 names, these names of judges and clerks are written, certifying that the above is the list of voters. Then there are two loose sheets of paper inclosed, not attached or referred to in the poll-book.

On these loose sheets there are names numbered on the margin from 654 to 926, but it is apparent from the paper that many of these names are fraudulent and fictitious, many of them written by persons not officers of the election. It appears from the tally-sheet that at one time the number of tallies had been 726 for the Democratic candidates, and *that* number carried out in the right-hand column, and at the foot of the tallies the names of the judges all signed in one handwriting, and the names of the clerks attesting. It also appears that in another handwriting *two hundred tallies have been added* to the Democratic candidates, *except* for Gibson Atherton, Judge of Supreme Court; Peter Brady, Treasurer of State; James Lawrence, Attorney-General, and for the member of the Board of Public Works, and for each of the candidates (except those above referred to) a circle has been put on the shoulders of the seven, making it a nine, thus increasing the vote on the tally-sheet two hundred votes.

This return, I think, should be rejected, because, first, it is not signed by the judges of election; second, the paper containing 272 votes is no part of the return, but is fictitious and fraudulent; third, because two hundred tallies have, from the appearance of the paper, been added to all the Democratic candidates for senator and others, after the return has been signed, and the tally-sheet thus mutilated by the change of 7 to 9. The whole paper bears such evidence of fraud that it should be rejected *in toto*. One of the judges is of opinion that only two hundred votes should be taken from the Democratic candidates, and another is of opinion that the whole must be counted. Under this condition of views, as my own as to the rejection of the whole vote is not concurred in, I accept that nearest to it, and concede to the rejection from the Democratic vote in this precinct of only two hundred votes.

We hold that to entitle a return to be received and canvassed by the board, it must be returned before the time fixed for the commencement of the canvass (six days after the election), as the canvass is by fair interpretation of law to be made of the returns received at *that time*. There is no provision of law giving the canvassers any power to deal with returns not *before them when the canvass begins*. Such provision is made for the government of the president of the senate, by section 2984 of the Revised Statutes. If the abstract from any county has not been received by him, recourse shall be had to the abstracts in the office of the secretary of state. And by section 2986, it is the duty of the governor and secretary of state, within ten days after the 1st of December, in the presence of the auditor of state and attorney-general to open the abstract No. 2 of returns made to the secretary of state for state commissioners of common schools, member of the board of public works, judge of the Supreme Court and members of congress; but if such returns have not been received from all the counties, and abstract No. 3, which contains the vote for governor, lieutenant governor, secretary of state, treasurer of state, attorney-general, state commissioner of common schools, etc., has been received by the secretary of state, they shall be governed by that abstract. And by the Revised Statutes, section 2992, where the returns of all the counties composing a congressional district, are not made within the time required by law, or where any of them are made after the certificate of election has been forwarded to the person, who, according to the abstracts received, has the highest number of votes, the secretary of state shall, in the presence of the governor, or, if he is absent, in the presence of the auditor and treasurer of state, when such abstracts shall have been received, open the same, and the governor shall certify them to the speaker of the house of representatives of the United States.

These particular provisions of duty having been made to govern these officers, the final canvassers of the vote of the state, when all the returns are not in at the time fixed for the canvass, and *no provision* whatever being made for such a contingency happening when the clerk and justices begin to canvass, we think clearly expresses the legislative intention that

161 State ex rel. Hardacre v. Dalton et al.

they shall canvass no returns which have not been delivered to them when they begin to canvass. This rule, too, is a reasonable one. It is in the interest of a fair and just count.

The law provides they shall commence to canvass on the sixth day after the election, or sooner if all the returns are in. Then it provides, too, that the re'urns shall be made to the clerk in three days after the election, sealed up, delivered by one of the judges, all this is in order that the officers of election shall act promptly, that there shall be no holding back of returns, no public exposure of them, no waiting until some indication of the general result is obtained from the canvassers in order that evil minded persons can prepare the missing returns so that they will make up deficiencies to suit their unlawful designs.

Under this rule the canvassers should omit from the canvass or count, the returns from precinct E of the eighteenth ward. The fact that the judges were ordered to sign it by the court of common pleas three days after the canvass began, will not give it validity as a return to be thus counted.

In our former opinion we held, that the tallies of the number of votes certified as cast must correspond with the number of persons certified as voting; that these canvassers could only count as many votes cast for the respective candidates as there were voters to cast them, and that as to any *excess* of votes over the number of voters, the court would, on the final hearing, determine what should be done with them. To this view a majority of the court still adhere.

In examining the returns, we find that in most of the wards there is an excess of votes over the number of voters. This excess runs from one to forty-two votes. When the excess of votes was less than ten, we have not taken it into consideration; but where more than that number, we have divided them proportionately between the two parties. (See McCrary on election laws, sections 298, 299 and 300.) In the nineteenth ward, precinct D, the excess is forty-two votes in 244 total, great enough to show fraud, and if it affected the general result we would be disposed to reject the whole return, but as it does not, we divided it proportionately as the others.

The result of the excess is as follows:

|  | Dem. excess. | Rep. excess. |
|---|---|---|
| Precinct G, Sixth Ward, deduct | 32 | 3 |
| Precinct D, Eighth Ward, deduct | 9 | 1 |
| Precinct D, Nineteenth Ward, deduct | 34½ | 6½ |
| Precinct B, Twenty-first Ward, deduct | 25½ | 8 |
| Totals | 101 | 18½ |
| Deduct Republican excess | 18½ | |
| Democratic net excess. | 82½ | |

As to the general result of the opinion of the whole court, the canvassers will be ordered, in canvassing and counting and abstracting the vote for the respective senators, to omit from said count and abstract the following precincts: Seventh Ward, Precinct E; Thirteenth Ward, Precinct C; Sixteenth Ward, Precinct E; Twenty-third Ward, Precinct B; returns from said precincts not having been delivered to the clerk by a judge of the election of the precinct, and Ninth Ward, Precinct F, because the so-called Duckworth Club report is not a legal return.

A majority of the court hold that the return of Eighteenth Ward, Precinct E, not having been delivered to the clerk until after the canvassing began, the canvassers must also not count or canvas the votes of that precinct; also that as to Fourth Ward, Precinct A, they should only canvas and count 726 votes for the Democratic canditates, and that they shall also deduct from each of the Democratic candidates for the senate votes as excess, in Sixth Ward, Precinct G, 32 votes, Eighth Ward, Precinct D, 9 votes, Nineteenth Ward, Precinct D, 34½ votes, Twenty first Ward, Precinct B, 25½ votes, Twenty-third Ward, Precinct B, 6½ votes and from the Republican candidates and excess in Sixth Ward, Precinct G, 3 votes, Eighth Ward, Precinct B, 1 vote, Nineteenth Ward, Precinct D, 6½ votes, Twenty-first Ward, Precinct B, 8 votes, making a total deduction on the Democratic vote of 101, and on the Republican vote, of 19½.

The result, according to our calculation, will be as follows for the respective candidates for senate:

| | |
|---|---|
| James C. Richardson | 33,734 |
| Amzi McGill | 33,588 |
| Frank Kirschner | 33,581 |
| G. W. Hardacre | 33,472 |
| Moses F. Wilson | 33,417 |
| James C. Hopple | 33,405 |
| Robert Kuehnert | 33,165 |
| John Brashears | 33,140 |

And the canvassers will accordingly be ordered to canvass, count, abstract and certify the votes for senator according to the foregoing result.

In striking off certain returns as illegal, we by no means disfranchise any voter, for our decision is not final. Any elector may still contest the election of any officer, and upon that contest these returns, if proven to be correct, or if no returns have been made at all, the error, if any, may be corrected by proof that any, and, if so, how many, persons have voted, and for what candidate. Our election laws are plain, explicit and easily comprehended, and, if carried out to the letter and spirit by intelligent, honest officials, they will reflect the honest vote of the people, and when so expresse l and counted, men of all parties should quietly submit to the result, however that result may be opposed to their wishes.

We are aware that there are many decisions in different states going in the direction of holding many of these rules to be merely directory, to be obeyed or not by the officers, but still the result to be sustained whether the law be exactly carried out or not. And every loose interpretation made by one court is cited as authority, not only to sustain it, but even to extend that looseness, so that relying on many of them, it is extremely difficult to learn whether there is any part of the law obligatory on the officers.

A return to a strict construction of all these statutes, holding and requiring the officers of all elections to adhere strictly to every provision of the statute in making and certifying the returns and canvassing them truly, rejecting all fraud and forgery, is the only true safeguard to insure the ascertainment of the true will of the people.

It has been urged that the rules we have laid down put too much power in the hands of the convassers; but when they shall learn that their conduct in every respect will be watched over, scrutinized and controlled by the courts, and they be held answerable to punishment for neglect or wilful violation of their duty, they will be more careful to perform that duty properly.

## JUDGE SMITH'S OPINION.

After hearing the full argument of counsel in this case, and after such careful consideration as I have been able to give it, I find that as to some of the propositions of law, announced by Judge Cox as the opinion of the majority of the court, I do not fully concur therein; and I state, therefore, as briefly as I can, my views on these questions.

During the progress of the case the court, in deciding the questions raised by the motion of the defendants to strike from the amended petition the greater part of the material allegations contained in it, stated several propositions of law which were thought to be correct, and applicable to the questions under consideration—though as to some of them there had not been a full argument; and it was afterwards arranged that counsel on both sides were to be allowed to make such additional suggestions thereon as they desired, that they might be further considered by the court; and this was done at the final submission; and counsel have certainly been exceedingly diligent in the collection of authorities, and argued with great ability the many difficult and important questions involved in the case.

One of the rulings then made, and from which the presiding judge dissented and gave his reasons therefor, was "that when a return is properly made by a judge of the election to the office of the clerk, on its face, substantially, in accordance with the law, it must be counted by them (the justices and clerk), though they may be satisfied that there was gross fraud in the election itself or in the returns thereof as made to the clerk, and that the court, in a proceeding of this character, can only require the board to canvass such returns, so received and that *it* cannot, any more than such board, go behind such returns; all we can do is to require *it* to do what the *law* requires of it."

I think the holding of the majority of the court on this point was clearly in accordance with the law—that the evident purpose and intent of the legislature in the use of the language, "that in making of votes they (the clerk and justices) *shall not decide as to the validity of the returns*, but *shall* be governed by the number of vot:s stated in the poll-books," was to make the duties of such board *ministerial only*, and *not* to confer upon it *any* judicial or *quasi* judicial power; and to expressly provide that it should accept the returns brought to the office of the clerk by the judge of the election precinct, acting under his oath of office (and where such return purports to be the return of the election board of such precinct), as the valid and legal return thereof, and to canvass it as such.

That this is so, I think is manifest, not only from the language of the statute itself, but that such interpretation of this and similar statutes is in accordance with the uniform current of authority, and is supported by the decisions of this and of every state of the Union in which the question has arisen, and I do not know of a single authority that supports the contrary opinion. In the case of Ingerson v. Berry, 14 O. S., 322, the court, in giving a construction to this and other sections of our election law, uses this language:

"The aggregate results of the returns, exhibited by the several poll-books, are to be ascertained by arithmetical calculation, and cannot be controlled by the discretion of the persons performing the duty. *Such counting of the votes, making of abstracts which exhibited the result, and giving certificates accordingly*, are duties which fall within the province of a clerk and accountant; they admit of *no discretion*, and are in their nature ministerial. The performance of such duties, therefore, may be enforced without assuming to control judicial discretion." And to the same effect is the language used by Judge Gilmore in the decision of the case of Phillips v. Schroeder, 26 O. S., 554, when in giving a construction to this same provision, he says: "The provisions of the statute defining the duties of these officers as canvassers are plain and unmistakable." * * * "The justices and clerks are not

161 .                    State ex rel. Hardacre v. Dalton et al.

clothed with the power of determining questions of fraud or illegality in elections. Where, as in this instance, the poll-book on its face was in form and substance regular, their only duty was to abstract and certify the vote." And it was held in that case, in which the clerk and justices had assumed to throw out the votes of a township in which confessedly there had been eighteen hundred more votes returned than there were voters in the township, that their act "was wholly unauthorized and illegal."

Judge McCrary, in his work on Elections, sums up the law thus: "Section 81. It is well settled that the duties of canvassing officers are purely ministerial, and extend only to the casting up of the votes, and awarding the certificates to the person having the highest number— they have no judicial power. In State v. Steers, 44 Mo., 223, which was a case in which the canvassing board had undertaken to throw out the returns from one voting precinct for an alleged informality, the court said: "Where a ministerial officer leaves his proper sphere and attempts to exercise judicial functions, he is exceeding the limits of the law, and guilty of usurpation." And again: "To permit a mere ministerial officer, arbitrarily to reject returns at his mere caprice or pleasure, is to infringe or destroy the rights of parties without notice or opportunity to be heard, a thing which the law prohibits."

And so far, Judge, SWING as I understand it, is of the same opinion, but thinks that if the return on its face shows that it has been falsified by the officers of the election, or others, before it is received by the clerk, that the rule does not apply, and he will state his views on this matter. But if the passages cited be correct statements of what the law is, it seems plain to me that the fact that upon the returns so made by a judge of the election in conformity with the statute, and purporting to be the return of the election board, and properly authenticated by it, there are appearances which would lead the minds of the members of the canvassing board to believe that the election board had committed great frauds in the conduct of the election, or had falsified the poll-books by the addition of a large number of names to the list of voters, and of tallies to some of the candidates, not representing real voters or ballots, even this would not justify it in assuming to decide that such return is, on such grounds, invalid, and to reject it, any more than it would if they were satisfied that there was fraud in the conduct of the election itself.

The claim is made here that in one such instance in this case, such a state of facts appears.

I refer, of course, to precinct A of the fourth ward. And I am free to say that there *is* very strong ground to believe that in this precinct the grossest fraud has been perpetrated, and it is, and it should be the wish and desire of every honest man and good citizen, that if it really *be* so, that it should not be successful, or avail to defeat the will of the people of the county as expressed by their ballots—and most certainly if I saw any way in which this court, in this proceeding could properly and in accordance with legal principles interfere to prevent it, I would gladly do so.

Fortunately, however, there *is* a mode pointed out by our statute by which such wrongs, if they exist, may be righted. It may be that it is not an adequate or complete remedy in *every* case, or in *any* case, but this is practically so as to *every mode provided* by law for the redress of injuries—but theoretically and in contemplation of the law, it *does* afford an adequate remedy. I refer, of course, to the proceedings authorized for the contest of an election; and as to this remedy, and the danger and impolicy of courts assuming a jurisdiction as to matters of this kind not conferred by the statutes, the language of Judge Scott deciding the same case of Ingerson v. Berry, (14 O. S., 323) is pertinent and forcible.

After directly affirming the right of the court in a mandamus proceeding, to compel a canvassing board to perform merely ministerial duties, he says "the importance in a government like ours of preserving the purity of elections, and of ascertaining truly, and rendering effective the will of the people, as fairly expressed through the ballot boxes, needs no comment. In the accomplishment of these purposes, the right of contesting all elections is, perhaps, *the most effective agency provided by law.* The duty of making such provision is solemnly enjoined upon the legislature by the constitution of our state. Its language is: " The general assembly shall determine by law before what authority, and in what manner, the trial of contested elections shall be conducted." Article II, section 21. And for the efficient exercise of this right of contest, provision has at all times been made by the legislation of the state,

" This is the specific remedy provided by statute for the correction of all errors, frauds and mistakes which may occur in the process of ascertaining and declaring the true expression of the public will. This controlling policy may not be nullified by the courts of the state, but should be protected and cherished with the same sedulous care that the constitution and laws evince."

If the board of canvassers assumes to decide that a return, properly filed with the clerk and purporting to be the return of the election board, is invalid, for the reason that on its face there are evidences that it has sent up a false return, can this be a ministerial act? Is it not, on the contrary, clearly judicial? It certainly involves the weighing of evidence for and against its validity, and the decision must be made in a case like that before the court, on the knowledge the board or the court might have of handwriting, and by the comparison of one part of the return with another, matters about which persons might well differ—but on evidence of this kind alone, for no other is permitted, the board in the first instance, or the court in a mandamus case, would have to decide the question whether the election board has been

        7    C C 1

guilty of fraud in the preparation of the return; for in my view, the presumption of the law would be that the return in the very shape in which it now is, was signed by the judges and clerks of election, at the close of the count, and duly sealed up by them and delivered to the judge of the election, who in the same condition conveyed it to the clerk's office. Such is the plain requirement of the statute, and the presumption, unless the contrary is made to appear, is that they complied with the law in these respects—and in my judgment such canvassing board has no such power, nor has this court in a mandamus proceeding.

I fully concede that *it* is the law that it *after* a return is delivered to the clerk, it is altered, either fraudulently or in good faith by mistake, that such alteration is invalid, and must not be regarded by the clerk and justices; but their duty then is, if possible, to ascertain its condition when filed with the clerk, and to canvass it accordingly. In view, therefore, of all the considerations I have adverted to, I adhere to the decision heretofore made by the court as I understand it, and to the extent therein stated.

But in connection with this doctrine of the law, there is another which should be considered with it, viz: that to entitle the board to canvass a paper so delivered, it *must be a return*, or at least *purport to be such*, made in pursuance of the statute, and if this does not appear on its face, that it should not be counted or canvassed.

Section 82 of McCrary on Elections, which directly follows the one before cited, states the rule thus. " But of course it does not follow from this doctrine" [of not going behind the returns] " that canvassing and return judges *must* receive and count whatever purports to be a return, whether it bears upon its face sufficient proof that it *is* such or not. The true rule is this: They must receive and count the votes as shown by the returns, *and they cannot go behind the returns for any purpose;* and this necessarily implies *that if a paper is presented as a return*, and there is question as to whether it *is* a return or not, they must decide that question from what appears upon the face of the paper itself."

It is upon this principle that I concur in the decision as to the alleged return from precinct F of the ninth ward. On the regular poll-book, that part of it known as the tally-sheet, returned with the list of the voters in that precinct, is entirely blank so far as any *writing* is concerned—there was not a single tally marked thereon, nor was there any statement on it of a single vote given to a single candidate in any form whatever, nor was the same signed by the judges and clerks, or any of them. When the envelope containing it was opened by the canvassers, they found inclosed in the tally sheet between two leaves thereof, and following the list of the voters, the paper known here as the Duckworth Club report.

At the hearing of the case another paper was found in the return, and Mr. Dalton, as a witness, was unable to say whether it was there when it was opened by the canvassers, or was put there some days afterwards when he called the judges and clerks of that precinct to enter the tallies on the tally-sheet, and sign the return thus made. This paper, whether there when the return was first opened or not, is headed "Prohibition Ticket," and contains in writing the names of the various candidates on such ticket, but *without any designation of the offices for which they were candidates*, with pencil marks to the right of the names in the form of tallies. Near the foot of the paper is written : "Attest: J. W. Royster, clerk," and "Attest, C. S. Brown, W. H. Deacon, J. W. McGill, judges," and on the face of the paper, in pencil, "Save for McGill."

The paper known as the Duckworth Club report was about 7 by 10 inches in size, folded in the center lengthwise. On the inside it was headed "October Election, 1885," and under the word candidates were the names of the Democratic and Republican candidates for the state, county and township offices, and opposite such names and under the heading *"Tallies"* appeared in figures a number, presumably of the votes given to each of said candidates, but the name of no Prohibition candidate appeared thereon, and there is no number opposite the form given for the vote on the constitutional amendment.

On the outside of the paper, on the first leaf thereof, appears in printing and writing the following indorsement : October election, 1885, Ward Nine, Precinct F, polling-place, Enginehouse, Sixth, near Vine. We hereby certify that we have compared the above totals with the tally-sheets in the —ward, precinct--, and that they agree.

Judges—W. H. Deacon, J. McGill, C. S. Brown.

Clerks—F. A. Maxwell, J. A. Royster.

On the last leaf are five instructions to "the person having this return in charge" as to the procuring the judges and clerks of the election to compare the totals marked on this return with the tally-sheet, and certifying that they agree, or, if they will not do so, that he obtain three other well-known and responsible persons to do so—the same, when completed, to be placed in an envelope and sealed up, and delivered to the Duckworth Club, No. 51 West Ninth street, on the night of the election."

Neither one of these papers found in the poll-book of this precinct purports on its face to be a return made by the election board to the county clerk for the purpose of being counted; but on the contrary, the latter of the two is apparently a return prepared for the Duckworth Club in persuance of the instructions, and those signing it certify it to be, *not the tally-sheet of such election*, but only that the totals agreed with it, and there was nothing whatever to indicate that it was a return made by the election board to the clerk in pursuance of law ; and the other papers amount to nothing, being simply a list of names with a few tally-marks. Such being the case, I think neither of them is entitled to be canvassed and counted as a return, but should be entirely excluded.

At the time of the decision of the motion referred to, I was of the opinion that the "poll-books" mentioned in section 2981 was the list of voters required to be kept at the election and returned to the clerk. Further consideration of the statutes and the authorities submitted have caused me to change my opinion on this point, and to believe that the meaning of the provision is that the board is to be governed in making the abstract by the number of *tallies* stated therein as being given to the different candidates, if the count was kept by tallies, as it ought to have been, and, if not, then by the number of votes otherwise stated and certified therein, as having been given.

It is to be noted that section No. 2960 provides explicitly for the form of the poll-book to be kept at the election and returned to the clerk. It consists of two parts first, a list of the names and numbers of the persons voting at the election; and, second, a tally-sheet on which the names of the candidates for the various offices are to be placed, with the votes for each in tallies, with forms of certificates by the judges and clerks. The whole of this paper is called a poll-book.

Now the statute provides that, in abstracting the same, the board "is to be governed by the number of *votes* stated in the poll-books." Where else can this be found, if the law is observed, other than in the tally-sheet? And it is the number of *votes* thus stated which is to govern, and *not* the number of voters; and in doing this, as I have before stated, the canvassing board is to accept the proper return of the election board.

This seems to be the proper interpretation to be placed on the language used in these sections, and, in my judgment, the provision referred to has precisely the same meaning as if read thus: ' In making the abstract of votes they shall not decide on the validity of the returns, but, on the contrary, shall be governed by the number of votes as stated in the poll-books to have been received by the different candidates"—the latter member of the sentence being added to emphasize and make more explicit and clear the evident intention of the legislature, that this canvassing board should not assume *any* judicial power whatever—and it seems to me clear that in view of the express restriction in the former part of the sentence against any such exercise of power, that by this latter clause it could not have been the purpose of the law-makers to lay down a rule under which a board of this character, established to do simple ministerial ac s (as the decisions quoted distinctly establish), with no power to hear the testimony of witnesses, would be frequently called upon to decide some of the most delicate and difficult questions, and about which a court of the highest authority, and with power fully to investigate it, might well hesitate as to the proper course to be pursued in a given case.

If such had been the intention of the legislature, is it not probable that it would have given explicit directions as to the exercise o. such power?—as to what should be done by the board, if the votes returned to the candidates for a particular office exceeded in number the names of those voting at the election—whether to reject the whole return, or deduct the excess from the different candidates in some particular way—or if the whole vote was to be rejected, when such excess was so great as to be indicative of fraud, how great such excess must be to raise such presumption. The fact that nothing of the kind was done, is a cogent reason for the belief that it was never intended that such power should be exercised.

While on this point, I may say, that by the express provision of the statute the vote is to be kept by *tallies*, and I think it follows that when it *is* so kept, and on the return as made to the clerk there is a difference between the number of tallies given to a particular candidate, and the amount as carried out for him by the judges of the election, that the canvassing board must in *all cases* be governed by the former—that one plan is not to be pursued in *one case*, and a different one *in another*. And as the evidence shows that such was the case here, and that in several instances these canvassers have not given to the candidates the number of votes, as shown by the tallies, that the abstract should be corrected in this respect.

There is one other proposition, as to which I am now of the opinion that the view of the court as announced in the decision heretofore made, is not sustained by the weight of authority. And that is, that if a return is not filed with the clerk before the commencement of the canvass, that it is not to be received or canvassed by the board.

And this involves a consideration of what is admitted on all hands to be a most difficult question—that is, to determine in a given case whether the terms of a statute which provides for the doing of an act at a particular time or in a particular way, are mandatory or directory only—that is, whether if not done in the exact manner provided for, but in a different way or at another time, the act so done *is* or is *not* utterly invalid. And this question arises as to several of the provisions of the statute under consideration.

So far as I am advised, the only one of the provisions of the election laws which has been stated in any decision of our Supreme Court to be mandatory in its character is that contained in section 2962, which is " that no election shall be set aside for want of form in the poll-books, provided they contain the substance." Judge Gilmore, in delivering the opinion of the court in the case of Phelps v. Schroeder, 26 O. S., 557, says: " This has reference only to matters of form and substance, appearing on the face of the poll-books themselves. It is *mandatory* upon all officers and tribunals to this extent."

On this question of the distinction between mandatory and directory laws, and when the court should hold them to be one or the other, I quote the language of two persons, distinguished for their ability as jurists, as stating the recognized law on this subject; and, first, hat of Judge McCrary in his work on Elections, section 200. " It is often a perplexing ques-

tion, whether a statutory provision concerning the manner of conducting elections is mandatory or only directory. We have already stated pretty fully the general rule upon this subject, and cited numerous authorities. These statutes are numerous and various in this country, and it would be an endless task to point them all out, and discuss the effect of each. The rule of construction to be gathered from all of the authorities was thus stated in Jones v. The State, 1 Kansas, 279, and approved in Gilliland v. Schuyler, 9 do., 569: "Unless a fair consideration of the *statute* shows that the legislature intended compliance with the provisions in relation to the manner, *to be essential to the validity of the proceedings*, it is to be regarded as *directory merely*."

And Judge Cooley, in his treatise on Constitutional Limitations, says, star page 617: "The statutes of the different states point out specifically the mode in which elections shall be conducted; but although there are great diversities of detail, the same principles govern them all. As the execution of these statutes must very often fall to the hands of men unacquainted with the law and unschooled in business, it is inevitable that mistakes shall sometimes occur, and that very often the law will fail of strict compliance. When an election is thus rendered irregular, whether the irregularity shall avoid it or not, must depend generally upon the effect the failure to comply strictly with the law may have had in obstructing the complete expression of the popular will, or the production of satisfactory evidence thereof. Election statutes are to be tested like other statutes, but with a leaning to liberality, in view of the great public purposes which they accomplish, and except where they *specifically* provide that a thing shall be done *in the manner indicated and not otherwise*, their provisions, designed merely for the information and guidance of the officers, must be regarded as directory only, and the election will not be defeated by a failure to comply with them, providing the irregularity has not hindered any who were entitled from exercising the right of suffrage, or rendered doubtful the evidences from which the result was to be declared."

In the light of the law as thus stated, what should be the holding of this court as to the provisions of this statute, which are held by one side to be mandatory, and by the other directory merely? In the first place, I may say that there can be no question that it was intended that all of the directions given in the statute should be observed—this was the purpose intended, and every officer upon whom the law imposes a duty and specifies the time and manner in which it should be performed, should by all means strictly follow such directions if in his power to do so; and a willful neglect or refusal so to do, is a violation of his oath of office, and in the highest degree reprehensible. They are wise and needful precautions against fraud, and for the true ascertainment of the will of the people, and in view of the facts disclosed in this case of the almost total disregard in many of the precincts of this county of the plainest provisions of the statute, in my judgment there is a crying necessity for the enforcement of the statute, which provides for the punishment of those officers who willfully or corruptly violate its provisions.

Now, as to some of these provisions of our election laws there can be no question but that they are directory only—the difficulty is to know how properly to decide as to what are such, and what are mandatory. One of the provisions of the statute as to which controversy exists here, is that contained in section 2981, which says: "That the clerk and justices *shall not receive* any paper as a poll-book of any precinct, unless it be delivered at the clerk's office by one of the judges of the election held in such precinct." It cannot be questioned that if from the language used in a statute, it is clear that the legislature intended to make a certain provision mandatory, that such construction must be given to it by all courts and tribunals called upon to act under it, no matter what such court or tribunal may think of the wisdom of such provision. And if I at all comprehend the force of the language here used, there can be no question of the mandatory character of this provision. It expressly says that the judges and clerks *shall not receive it*, unless so delivered. If they cannot *receive* it they can do absolutely nothing with it, but reject it. If it had said that they should not receive, count, or abstract it, but should absolutely reject it, could any one properly claim that if the board did receive, count and abstract it, that such action could be allowed to stand? I think not, and yet the additional words would give no additional strength to the *direct prohibition* against its acceptance as a return.

But does the other provision to which I have referred, present so plain a case? Evidently it does not. It is obviously true that the statute provides that the judge of the election, upon whom that duty is imposed, shall convey the return to the clerk within three days from the the day of the election, and that the clerk, on the sixth day after the election, or sooner, in case the returns are made, shall take to his assistance two justices of the peace, and proceed to open the several returns made to his office; but it is equally true that the statute nowhere provides *specifically*, nor, so far as I can judge, by implication even, that unless the returns are there before the canvass is commenced, that they shall not be counted. A contrary construction must be founded entirely on the idea that the meaning of the statute is, that the opening is to be of the returns then received, and on the further view that a contrary construction would open a door to fraud by the opportunity thereby afforded for a change of returns to meet the exigency of the count. But it is for the legislature to determine whether to make a statute mandatory or directory, and as this intention, according to the authorities, must appear from the language of the statute itself, or of statutes *in pari materia*, and in my judgment does not so appear here, I am of the opinion that the board was right in receiv-

Vol. I.                                    CIRCUIT COURTS.                                    101

161                          State ex rel. Hardacre v. Dalton et al.

ing the return from precinct E, eighteenth ward, or at least that having done so, it ought not now be required to omit it from the canvass.

There are many errors and irregularities in a great number of the returns and objected to both by counsel for the relators and for the defendants. But the view which I have taken of the law on this point convinces me that they are of form simply and not of substance, and should not now be excluded from the court, and especially so as in no instance, that I recall, any suggestion is made that the returns, except in the cases to which I have heretofore referred, were not those of the precinct for which they were received and counted, and the real vote of such precinct.

## JUDGE SWING'S REMARKS.

Not agreeing with Judges Cox and Smith in all the matters submitted to us, I desire to express my views on the questions wherein we differ.

As to fourth ward, A, on the motion to strike out, I held with Judge Smith that all we could do in this proceeding was to compel the canvassing board to perform the duties enjoined upon it by law. The statute defining its duties says that they shall not pass on the validity of the returns. What is the meaning of this sentence? If we can ascertain it, we will have found an important key to many questions in this case. It seems to me clear that it means that they shall not go behind the returns. That is a common expression that has a legal signification as well. That judges of the election have two kinds of duties to perform. They conduct the election, receive the votes, pass on the qualification of the voters, close the poles, and at certain times and in certain ways they are to do particular things. The most of these pertain to the election. Then they are to count the vote and make a return of the same, and this record or return is for the canvassing board, and on it they are to pass. But they are not to pass on those things which are not a part of the return, but that they must of necessity pass on the face of the returns. Their duty is similar to a court passing on a written contract or will. They cannot go outside, but must hold it up by its four corners and say whether it is a will or a contract or a return, and say what it means. If the word "validity" as here used, does not refer to those things outside of the return and on which it rests, there would be no use for this board to exercise sense, discretion and judgment, as it is said they should do in 38th O. S. Any and everything that came to them, would have to be counted if they were not to pass on the face of the returns. The reason of the laws seems to me to be that this board, a board composed of the clerk and two justices of the peace, three men from the nature of their offices in whom the people reposed confidence, and who would be supposed to have sense, discretion and judgment, had an important duty to perform. It is not merely arithmetic and penmanship that is required. They are to pass upon and abstract the returns, but they are not to inquire into the conduct of the judges and clerks who make the returns, as to matters which do not appear before them on the returns. These are for another tribunal, but only in this action of the canvassing board is the ultimate object the ascertainment of what are the results of the lawful returns. In a contested election case the inquiry is, who received a plurality of the votes? The returns would be proper evidence, but their correctness would not be the ultimate object of inquiry, whereas here it is.

The cases cited by counsel in the 14th and 26th Ohio State to my mind clearly show this. The first proposition of the syllabus in the 26th Ohio State says: "When the poll-books upon their face are substantially correct, the justices and clerk in making the abstract of the votes are not authorized to reject such poll-books on account of fraud in the election." But if a fraud has been committed on the return itself, after the judges had performed their work and this was shown on the face of the return, it would not be passing on the validity of the return, but it would be saying what the return as made by the judges said it was. This is shown clearly by section 82 of McCrary, which is as follows: "But of course it does not follow from this doctrine (speaking of the same doctrine as is stated in 26 O S.) that canvassing and return judges must receive and count whatever purports to be a return, whether it bears upon its face sufficient proof whether it is such or not."

Applying these principles to fourth ward, A, I think all matters not appearing on the face of the returns were, properly ruled out. But what does the face of the returns show? Folded within the returns are two sheets of foolscap paper, on which are written 342 names. On the regular form of a poll-book are written 654 names, occupying all the ruled and numbered spaces on the poll-book. The names on the sheets of foolscap are consecutively numbered, commencing with No. 655. These sheets of foolscap are in no manner attached to the poll-book, and contained nothing more than I have stated, except some figures. They in no way appear to be a part of the poll-book except that they contain names and begin in their number where the regular poll-book left off. And by intrinsic evidence it has been proven that they were found in the poll-book by the canvassers when the poll-book was opened. Whether or not these loose sheets should be considered a part of the poll-book, in my opinion, depends upon whether the poll-book proper shows them to be a part of it. Standing alone they are no part of the poll-book. Does the poll-book and tally-sheets furnish the necessary evidence to prove them to be a part of the lawful returns? In part I think it does, but not in all. The tally-sheet shows a horrible face. It is bruised, scratched and mutilated, the result of ignorance or crime, and undoubtedly crime. It shows that at one time every candidate on the Democratic ticket had been credited with 726 tallies by tally marks, and this had been carried out in the column of totals and put down in figures. After the judges and clerks had counted

out the votes and found this number, and placed these totals on the poll books, and had signed the same, 200 votes in tallies have been added to all the Democratic candidates, and in the column of totals the figure 0 has been placed on the figure 7 so as to give it the appearance of the figure 9, except on one page of the tally sheet, which contains the votes for supreme judge to fill vacancy, treasurer of state, attorney-general and member of board of public works. This page is unmutilated, and all the candidates on the Democratic ticket have 726 tallies and 726 totals in figures. It is regularly signed by judges and clerks, and shows conclusively, beyond any question, that at that time the count of the precinct had been completed. On looking at the other pages of the tally sheet the same thing appears. In every instance the figures 726 appears, which would not have appeared until the count had been completed. And besides, in every instance, the tally marks commencing with 727 appear in different shading of ink, showing that the blotter had been applied at different times. But as a convincing proof of this, Brashears, for senator, has 726 marked as his total, while 926 appears in tallies. Now, let us see how this supports the loose sheets. Commencing with the last 200 names we find a change in the handwriting, and we find among the names, within seven names, Summers, Winter, Spring and Fall (with initials) voting. It is not within possibilities that these names represent voters. We are therefore certain, in fact it will not and cannot be questioned by anyone, but that these two hundred names on these loose sheets of paper, and these two hundred tallies and the changes or attempted changes of the figures 726 to 926, were made by some person or persons after the count had been made and the judges and clerks had signed and certified to the poll-book and tally-sheets. To the extent, therefore, of these two hundred names on these loose sheets, I hold that they are not properly identified so as to be considered a part of this poll-book. These changes having been made after the completion of the count and certification by the judges and clerks, it is a forgery. And it matters not whether done by the judges or others, it is equally a forgery; and the fact that it was done before it got into the hands of the clerk can make no difference. It must be the same whether it was done the next minute after the count was made as well as ten days after. It is a crime on the face of it, and the law never intended it should stand any more than if it had been no return at all. Now, it does not appear to my mind on the face of it that to count the return as originally made was any forgery, and, therefore, I hold that while back of it and beyond it, it may have been a fraud and not a lawful return, still, following the 26th O. S., which is in harmony with all the authorities on that point, it appearing on its face to be regular, the clerk and justices are not authorized to reject it entirely, and, therefore, with these two hundred added on erased, it must be counted as originally made, to wit, count the sevens and reject the nines.

As to the question whether the time within which a return shall be delivered, in regard to what is mandatory and what is directory in the statute as applicable to the questions before us, I see no reason to depart from the rule as laid down by us in our decision heretofore. This is a perplexing subject of the law. The rulings of the courts cannot be reconciled, and Mr. Cooley in his great work on Constitutional Limitations says he will not attempt it. But on page 89, fifth edition, he quotes two authorities which I believe to contain the substance of the correct rule to be applied by courts to the consideration of these questions. The first is "Lord Mansfield would have the question, whether mandatory or not, depend upon whether that which was directed to be done, was or was not of the essence of the thing required."

The second is (quoting from 19th Barb, 540): "Statutory requisitions are deemed directory only when they relate to some immaterial matter where a compliance is a matter of convenience rather than of substance." These rules seem to me to be fu l of wisdom and common sense, and to be in conformity with the other well-established rules of construction. And it is only when these are departed from that we find the errors and conflicting rulings which are to be found in the books, and which have been so unfavorably commented on by many of our able judges and text writers. These errors and conflicting decisions, I think, have arisen from holding that where things are to be done in a particular manner and at a particular time, it is to be considered as directory and not mandatory This rule, I think, is neither supported by reason or authority. The presumption is that it is mandatory, unless from the law itself it appears certainly to be not of the essence of the thing required, in which case it will be held directory

Mr. Sherwick, in his admirable work on the Construction of Statutory and Constitutional Law, and in his clear and concise way, says, on page 324: "It seems to me difficult to deny that the practice of sanctioning the evasion or disregard of statutes, which we have had occasion to notice in the cases thus examined, has been carried beyond the line of sound discretion. The idea has been repeatedly expressed: I am not very well satisfied with the summary mode of getting rid of a statutory provision by calling it directory." Again on page 325 he says: "The intention of the legislature should control absolutely the action of the judiciary. When that intention is clearly ascertained, the courts have no other duty to perform than to execute the legislative intent without any regard to their own views as to the wisdom or justice of the particular enactment." Speaking as to matters of form, he says, on page 322: 'I think' it may well be doubted whether in the desire to sustain proceeding against which no bad faith has been alleged, a proper regard for form and regularity h s not been lost sight of. It is extremely difficult in these cases to prove actual fraud. The very object of forms of proceeding is to secure regularity and fair dealing, and the recognition of the doctrine that explicit provisions of statutes can be disregarded with entire impunity as to the result of the particular

proceeding, is likely to lead to unbounded negligence and indifference on the part of public officers, who have, as a general rule, little to fear from criminal proceeding directed against them personally."

Applying this to returns not handed to the clerk within the time prescribed by law, our statute says that the returns shall be delivered to the clerk within three days from the election and taking this with the other section, which provides that the clerk shall, within six days, or sooner, if the returns are all in, proceed, etc., is there any difficulty in ascertaining what the legislature has s id? None at all. Is there any difficulty in ascertaining its meaning? I think not. What, therefore, can be the reason for substituting the judicial views for the legislative intention? It cannot be found in the words of the act. Can it be found in the reasons of the subject-matter to which it is to be applied? Is it not of the essence of the law that the returns shall be in within three days, or at least before the clerk begins his count? The language of the statute plainly says it is. Does it relate to a matter of convenience rather than of substance? Can there be anything more of the essence of honest elections than that the returns shall be completed as soon as possible and deposited in the hands of their proper custodian? Can there be any reason why every honest election return in Ohio should not be in the hands of the clerk within the three days named? I see none. In reason, is it not a matter of substance that all the returns should be in the hands of the clerk before the count begins? What a temptation to perpetrate fraud and alter the returns held back after the result has been ascertained in those counted! We all remember, last fall, when the election of the president was in doubt as to the vote in New York, and when the people were wrought up to great excitement, there was great comfort to be found to the lovers of our country in that the laws of New York required all returns to be quickly made to the proper officers, and that there was no chance to alter or change them. And I take it that in no part of our election laws is there more of substance than in this. It is, therefore, mandatory, and being mandatory and not being done as prescribed, it is void and of no effect. (See Bishop on the Written Law, section 254).

In regard to excesses of votes appearing on the poll-books over the number of votes cast, I think our former holding is correct. Whether correct or not depends upon the construction to be given to that portion of section 2731, which says: "And in making the abstract of votes, they shall not decide on the validity of the returns, but shall be governed by the number of votes stated in the poll books." What is meant by " but shall be governed by the number of votes stated in the poll books?" Does it mean that no more votes shall be counted than there were shown to have been cast, or that they shall be governed by the number of tallies put to each candidate on the tally-sheet, or shall they be governed by the number put down in figures as the votes of each candidate? It is clear to my mind that standing alone it may be construed to mean either of these. We must, therefore, look to the balance of the statute referring to the same matter, and see which construction would best harmonize with it, and ascertain the mischief to be remedied, in order to get at the intention of the legislature. For it has been well said that a thing may be within the letter of the statute, but not within the statute, while a thing may be within the statute, and yet not within the letter of the statute.

No thoughtful observer can fail for a moment to appreciate the importance to our government of having our elections free from fraud, or even suspicion of fraud, for the very foundation of our government rests upon the purity of our elections. When our elections fail to express the will of the people, revolution must follow. That our legislature fully comprehended this, is plainly shown by looking at the different provisions of our statute. Every precaution is taken to preserve the integrity of the elections. Look at sections 2951, 2952, 2953 and 2954. Everything that can look like fraud is to be held fraudulent. If two ballots are folded together, it shall be conclusive evidence of a fraudulent intent and neither shall be counted; and so when a ballot contains a greater number of names for an office than are required to fill the office, all shall be rejected, clearly showing that a bare suspicion of fraud is not to be entertained. Section 2956 provides, "At the close of the polls the poll books shall be signed by the judges and attested by the clerks, and the names therein contained shall be counted and the number set down at the foot of the poll-books in the manner hereinafter provided in the form of the poll-books," and section 2957 provides, among other things: "And the same method shall be observed in respect to each of the tickets taken out of the ballot-box until the number taken out of the ballot-box is equal to the number of names on the poll-books." The object of having a poll-book is here apparent. It is to show who voted and how many votes were cast. Now, what can be the object of sending the poll-book to the canvassing board unless it be to control the canvassing board in not counting more votes than were cast? Can it be that, after showing such care to preserve the purity of the elections from every taint of fraud, a glaring fraud on the face of the returns must stand? Such a construction seems to me to be so violent and so out of harmony with the whole legislative intent so clearly expressed, that it cannot be entertained for a moment.

It certainly can be no answer to say that it cannot mean that the board shall count no more votes for candidates than there appear to have been votes cast, for the reason that they have made no provision as to what shall be done in that case with the excess of votes credited to the respective candidates. It is the duty of those enforcing laws to use sense and judgment in carrying them out. It is admitted by all that when the tallies and figures dis-

agree, that the board shall count the tallies and not the figures, and yet the law does not say so. This is supplied by reason and common sense, and the same must be done with all laws. No laws could be enforced if it were not done. Neither can it be said that these frauds, for it is a fraud in fact to count more votes than there were votes cast, can be adjusted in a contested election case. Frauds appearing on the face of the returns must be corrected by those who deal with the face of the returns. It seems to me there is more reason to hold that this provision was intended to mean, and does mean, that the board cannot count any more votes than there were votes cast, and so stated in the poll-books. By so holding it subserves an important purpose and tends to preserve the purity of our elections. To hold otherwise, is to make our law lame and offer an inducement to commit fraud.

At the conclusion of the reading of Judge SWING's opinion, Judge Cox said:

I want to say further, in regard to precinct C, of the twenty-second ward— the paper that was so terribly scribbled and illegible—I think that whole ward should be rejected. I stand in the minority in regard to it. It is not entitled to any respect. There are a large number of names not in a condition, it seems to me, that any person can understand; no person can read them, and they are evidently made with the intention that nobody should know who they were.

Counsel for defendants have asked us to make a finding of facts and a finding of law. If counsel on each side will prepare what they regard as the proper finding of facts under our decisions, and hand them to us by Friday, we will examine them and prepare one from them.

Thomas McDougall, Drausin Wulsin, W. M. Bateman and E. F. Noyes, for relators.

John F. Follett and Isaac M. Jordan, for Dalton and Bloom, and L. M. Hadden, for defendant Sanderson.